IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| STEWART ARNOLD, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA, et al., | : | NO. 16-4103 |
| Defendants. | : | |

# MEMORANDUM OPINION

**TIMOTHY R. RICE**                                                                                December 19, 2017
**U.S. MAGISTRATE JUDGE**

      Plaintiff Stewart Arnold alleges Fourth and Fourteenth Amendment violations against the City of Philadelphia and several individual police officers based on his 2014 arrest and incarceration until February 2016, when charges against him were dropped. Am. Cplt. (doc. 44) at 12-27. Defendants seek summary judgment (doc. 67), contending all of Arnold's claims must be dismissed based on the undisputed facts. City Br. (doc. 67-1) at 9. I agree that all claims against the City of Philadelphia, Victor Valenzona, and Confidential Informant ("CI") 01338 must be dismissed.[1] I further dismiss the claims for unlawful search and seizure (Count IV) and assault and battery (Count VIII) against all defendants because Arnold concedes they lack merit. See Pl. Br. (doc. 70) at 10, 18.

      The remaining claims for false arrest/imprisonment and malicious prosecution against Officers Campbell, Eleazer, McKnight, Mouzon, and Towman, however, are not subject to summary judgment. According to the officers, they had probable cause to arrest Arnold when they executed the search warrant, there was no constitutional violation, and they are entitled to qualified immunity. According to Arnold, the officers realized they lacked probable cause to

---

[1]     It is unclear whether Victor Valenzona and the CI were ever served with the Complaint, and no claims are properly stated against them. See City Br. at 1 n.1.

arrest him and intentionally misled prosecutors by completing the investigative report, arrest report, and property receipts with misleading and/or incorrect information. A reasonable jury could credit Arnold's version of events over the officers', precluding a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## I. Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Disputes are "genuine" if the evidence could support a verdict for the non-moving party, and "material" if they "might affect the outcome of the case." Anderson, 477 U.S. at 248. In determining whether there is a genuine dispute of material fact, the evidence and any inferences from the evidence must be viewed in the light most favorable to the non-moving party. See Ray v. Warren, 626 F.2d 170, 173 (3d Cir. 2010). If reasonable minds could conclude that there are sufficient facts to support a plaintiff's claims, summary judgment should be denied. See Anderson, 477 U.S. at 248. Alternatively, summary judgment should be granted if no "reasonable jury could return a verdict for the nonmoving party," based on the evidentiary record. Reedy v. Evanson, 615 F.3d 197, 210 (3d Cir. 2010).

## II. The Facts in the Light Most Favorable to Arnold

Arnold was hired by Julius Phillips, a childhood friend, to demolish the wall between the dining room and kitchen at 2607 North Hollywood Street beginning on July 9, 2014. Arnold Dep. at 22-23. Phillips agreed to pay Arnold $50 per day for two days, and let Arnold into the property at approximately 8:00 a.m. on July 9. Id. at 24-25, 56. Arnold worked in the back part of an attached living room/dining room area, behind a black drape that was hung to protect the front section of the house from debris. Id. at 23, 29. While he worked, Arnold noted that Amir

Crawley, an acquaintance who lived in the area, was "coming and going." Id. at 26-27. Arnold could hear music playing, but did not know for certain what Crawley was doing, although he knew that Crawley was "not a good kid." Id. at 29, 31. Arnold let himself out around noon or 1:00 p.m., locking the door's bottom lock behind him. Id. at 24-25, 37.

Between 3:00 and 4:00 p.m. on July 9, Philadelphia police officers McKnight and Mouzon had a CI purchase illegal drugs from someone at 2607 North Hollywood Street, using marked bills. July 10, 2014 Investigative Report, attached as Exhibit D to Pl. Br. ("Inv. Rep.") at 1. They returned within the hour, this time with Officer Eleazar, to conduct a second controlled buy. Id. Although McKnight now claims he saw Arnold answer the door and let the CI inside during this second purchase, N.T. 7/29/14 at 18; see also McKnight Dep. at 100, 114-15, Arnold denies it, Arnold Dep. at 24.

Later that day, McKnight prepared a probable cause affidavit to obtain a search warrant for 2607 North Hollywood Street. Search Warrant 181310. According to the affidavit, the first, $20 purchase recovered substances in four green ziplock packets that tested positive for marijuana using field test "E." Id. The second, $10 purchase was conducted by the same CI, and McKnight attested that he saw an unknown black man let the CI into the property. Id. This second controlled buy recovered two green-tinted Ziplock bags. Id. According to the search warrant, the substance in these bags tested positive for cocaine using field test "G." Id.

McKnight also completed two Property Receipts ("PR") on July 9.[2] PR 34 is consistent with the search warrant affidavit, and describes four green-tinted ziplock bags of marijuana, as confirmed by field test "E." PR 34. PR 35 is inconsistent with the search warrant affidavit. It describes two green-tinted ziplock bags of marijuana, confirmed by field test "E," instead of the

---

[2] Because all Property Receipts related to this case are identified with seven-digit numbers beginning 31569, I reference only the receipts' final two digits for clarity.

3

cocaine confirmed by field test "G" described in the probable cause affidavit. PR 35. The "from whom taken" box on each receipt is filled out "Confines of the 22nd Dist."

McKnight's search warrant was approved the following day, July 10. Id. at 1. Arnold arrived at 2607 North Hollywood Street that day at 10:00 a.m. Arnold Dep. at 25. Again, he was aware of Crawley at the residence, including during the few minutes it took Arnold to go to a local store, purchase a sandwich for lunch, and return. Id. at 26. Arnold testified he never saw the quarter pound of marijuana, shotgun, and scale later found in the front area of the living room. Id. at 30. While he was eating lunch, Arnold heard a "commotion," peeked around the drape, and saw Crawley had run out of the front door. Id. at 28, 61. Afraid that someone was about to get shot, Arnold ran out of the house's back door without seeing anyone enter.[3] Id. at 28, 32.

Behind 2607 North Hollywood Street, Arnold encountered one plainclothes police officer who identified himself as police. Arnold Dep. at 33. After Arnold surrendered, two uniformed officers joined them. Id. at 33, 57. One uniformed officer, Towman, tackled Arnold, lacerating Arnold's right hand. Am. Cplt. at ¶ 132-33; Arnold Dep. at 35. Arnold was brought to the front of 2607 North Hollywood Street through an adjacent lot, and McKnight asked Arnold for his name, address, and other identifying information. Arnold Dep. at 58. When Arnold told McKnight that 2607 North Hollywood was not his residence, McKnight responded by saying something to the effect of, "That sucks for you." Id. at 65. Arnold was taken to the hospital, where doctors spent about an hour stitching up his hand. Am. Cplt. at ¶ 134, Arnold Dep. at 36.

---

[3] Arnold admitted he was smoking marijuana and taking Percocet recreationally during July 2014, but denied that he was under the influence of either substance while working at 2607 North Hollywood Street. Arnold Dep. at 60, 68.

4

Later on July 10, 2014, McKnight prepared an Investigative Report. He described the controlled buys from July 9 the same way he had in the search warrant, including that the second purchase's product tested positive for cocaine using test "G" and that an "unidentified" black male had opened the door for the CI. Inv. Rep. at 1. Arnold was not identified as the male.

Further down that same page, however, McKnight described "another black male," whom he had "later [identified] as Arnold Steward," leaving the property. Id. McKnight included a description of a third controlled buy that took place on July 10 before the search warrant was executed, as well as descriptions of the search warrant execution and arrests. Id.

According to this Investigative Report, Crawley shut the front door on Officer Campbell as he tried to execute the search warrant and, once police gained entry, they saw Arnold run from the living room towards the back of the house. Id. McKnight was behind the house, and saw Arnold run out of the back of the property and climb over the gate. Id. In searching Arnold, police recovered $97 in unmarked bills and a silver key for 2607 North Hollywood Street. Id.

In the living room, officers found a shotgun, shotgun shells, one clear baggie with a significant amount of marijuana, one clear baggie containing other clear baggies containing marijuana, and a marijuana grinder and scale. Id. From the second floor bedroom, the officers recovered two scales, one packet of unused green ziplocks, one packet of unused blue ziplocks, and six clear baggies with marijuana. Id. There is no evidence that police recovered any of the marked bills used in the three controlled buys.

McKnight also completed six property receipts on July 10, 2014. PR 38 identifies "from whom taken" as "Arnold Steward," with an address of "2607 North Hollywood St." PR 38. It describes four green-tinted ziplock packets of marijuana that had been "purchased by [the] CI." Id. PR 39 also describes 23 unmarked bills totaling $97 taken from "Arnold Steward" of "2607

North Hollywood St." PR 39.  PR 40 identifies "Arnold Steward" of "2607 North Hollywood St." as the source of: one clear ziplock bag of marijuana; one clear ziplock bag containing nine knotted plastic bags of marijuana; one purple ziplocked packet; and six knotted plastic bags of marijuana.  PR 40.  Under "Circumstances," PR 40 states: "On above date, time and location Search Warrant #181310 was executed.  Above deft arrested above evidence confiscated."  Id.

PR 41 also lists Arnold as the source and describes five items: (1) a key; (2) a grinder; (3) three digital scales; (4) a clear ziplock with red markings containing unused green ziplock packets; and (5) a clear ziplock with red markings containing unused blue ziplock packets.  PR 41.  The "circumstances" on PR 41 are: "On the above date and time, the above items was confiscated during the arrest and execution of search warrant #181310 at 2607 North Hollywood St."  Id.  PR 42 identifies "from whom taken" as "inside the location," and gives the address of 2607 North Hollywood St.  PR 42.  It describes "one black color shotgun . . . loaded with five live rounds," and notes in "circumstances" that "[t]he above weapon was confiscated at the location . . . during execution of S&S #181310."  Id.  The final receipt, PR 43, attributes to Amir Crawley of 2604 North Hollywood Street one green-tinted ziplock plastic packet containing marijuana.  PR 43.

The next day, July 11, 2014, McKnight completed an arrest report for Arnold that lists his address as 3841 Folsom Street, but notes that Arnold gave 2607 North Hollywood Street as his address when he was arrested.  PARS at 1.  At the preliminary hearing later that month, McKnight testified he saw Arnold open the door for the CI during the second controlled buy and was present when Officer Towman arrested Arnold and recovered the key to 2607 North Hollywood Street.  N.T. 7/29/14 at 13, 18, 20.  During a motions hearing on October 24, 2014, both McKnight and Mouzon testified they saw Arnold open the door for the CI during the second

6

controlled buy. N.T. 10/24/14 at 17, 48. Mouzon testified Arnold – not Crawley – shut the door in an officer's face during execution of the search warrant. Id. at 29. McKnight testified he was already behind the property at that time. Id. at 53. Further contradicting the Investigative Report and PARS, which states that Mouzon stopped Crawley and found marijuana on him and then that the warrant was executed, Inv. Rep. at 1, PARS at 2, Mouzon testified he arrested Crawley only after the search warrant was executed, N.T. 10/24/14 at 26, 29.

On September 18, 2015, McKnight made three handwritten changes to the July 10 Investigative Report: (1) he changed the letter identification of the field test on the substance from the second controlled buy to "E," but left the conclusion that the substance on PR 35 tested positive for cocaine; (2) he changed the location Crawley was described as entering before the search warrant was executed from 2607 North Hollywood Street to 2604 North Hollywood Street; and (3) he changed the identity of the individual who allegedly shut the door on Officer Campbell during the execution of the search warrant from Crawley to Arnold. Am. Inv. Rep. (attached to Def. Resp. as Exhibit T) at 1. Thus, according to the amended Investigative Report, Crawley was arrested after re-entering 2604 North Hollywood, and Arnold shut the front door on Campbell and then ran out of the back door of 2607 North Hollywood. Id.

In 2015, Officer McKnight tested positive for cocaine during a random drug screening. McKnight Dep. at 286-87. Rather than contest the results, he retired from the police department. Id. at 288. Charges against Arnold were dropped in February 2016. Commonwealth v. Arnold, No. CP-51-CR-8679-2014 Crim. Dkt. at 10.

### III. Counts I – III Against the City of Philadelphia

A municipality cannot be held liable under respondeat superior. Thomas v. Cumberland Cty., 749 F.3d 217, 222 (3d Cir. 2014). To bring a civil rights action under 42 U.S.C. § 1983

7

against the City of Philadelphia, Arnold must establish the city implemented a policy or custom that caused the alleged constitutional violation. Monell v. Dept. of Social Services, 536 U.S. 658, 691-95 (1978); Bielevicz v. Dubinon, 915 F.2d 845, 849-50 (3d Cir. 1990) (the government itself must have supported the constitutional violation). To incur Monell liability, a policy must have been made in "an official proclamation, policy, or edict" by a decisionmaker with final authority. Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990). A custom can support Monell liability only if Arnold proves a course of conduct so pervasive that it has the same effect as an official policy. Fletcher v. O'Donnell, 867 F.23d 791, 793-94 (3d Cir. 1989). Finally, Arnold must also show the policy or custom was the "direct caus[e]" of the constitutional deprivation. City of Canton v. Harris, 489 U.S. 378, 385 (1989). To establish municipal liability based on a failure to train, a plaintiff must show more than negligence; he must show a failure to train that "reflects deliberate indifference" to the violated constitutional rights. Id. at 392.

Arnold fails to identify a policy that could serve as the basis for municipal liability, and I have found none. Further, the evidence shows extensive police training, and Arnold has made no credible argument explaining how the training was inadequate. See Pl. Resp., Com. Br. at Exs. B, C, D, F, G, H, I, J, O, Q, R. Dr. McCauley's expert report, which discusses unrelated prior police misconduct Dr. McCauley found during an internet search of the Philadelphia Police Department, also fails to identify actionable failures of the police department. McCauley Report, attached as Ex. BB to Pl. Resp., at 11. Each of Dr. McCauley's actual conclusions address actions of the individual officers, not the City of Philadelphia. Id. at 12.

Because Arnold has offered no theory for municipal liability, I grant summary judgment and dismiss all claims against the City.

### IV. Counts V and VI for False Imprisonment/Arrest

Under 42 U.S.C. § 1983, Arnold must show he was deprived of his federal constitutional rights while defendants acted pursuant to state law. See West v. Atkins, 487 U.S. 42, 48 (1988). To prevail on a Section 1983 claim involving a violation of the Fourth Amendment due to false imprisonment, Arnold must show: (1) he was detained, and (2) his detention was unlawful. Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994). Under Pennsylvania law, false imprisonment and false arrest claims are identical. Lennon v. Sharon Hill Borough, No. 12-6701, 2014 WL 1395038, at *3 (E.D. Pa. April 10, 2014).

Probable cause is a defense against a Section 1983 false arrest/imprisonment claim. Berrios v. City of Phila., 96 F. Supp. 3d 523, 531 (E.D. Pa. 2015). Police have probable cause to arrest if they have a reasonable belief "that the [arrestee] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). To determine whether there was probable cause to arrest, a court must examine the "totality of the circumstances." Walker v. Spiller, 54 F. Supp. 2d 421, 425 (E.D. Pa. 1999). Only those circumstances known to the officers at the time of the arrest may be considered. Wright v. City of Phila., 409 F.3d 595, 603 (3d Cir. 2005). Moreover, police officers are immune from liability on the basis of a false arrest unless, "on an objective basis, it is obvious that no reasonably competent officer would have concluded that probable cause existed." Radich v. Goode, 886 F.2d 1391, 1395 (3d Cir. 1989).

Mere presence at the location of illegal activity is insufficient to establish probable cause to arrest. Ybarra v. Illinois, 444 U.S. 85, 91 (1980). Because "[t]he Fourth and Fourteenth Amendments protect the 'legitimate expectations of privacy' of persons, not places," the Supreme Court has found "a search or seizure of a person must be supported by probable cause particularized with respect to that person." Id. Even accompanying a felon to a meeting held in

9

furtherance of a criminal conspiracy can be insufficient to establish probable cause if there is no information suggesting the arrestee is involved in the conspiracy and accompanying circumstances suggest he could have been unaware of the criminal activity. United States v. Di Re, 332 U.S. 581, 593 (1948) ("Presumptions of guilt are not lightly to be indulged from mere meetings.").

The Commonwealth contends probable cause to arrest existed on the basis of four undisputed facts: (1) 2607 North Hollywood was a known drug location, based on the CI information and three controlled buys made before the execution of the search warrant; (2) Arnold was inside the location both days; (3) Arnold fled from police during execution of the search warrant; and (4) materials recovered from the execution of the search warrant showed the location was being used to distribute illegal drugs. Com. Br. at 9 (citing Walker v. Spiller, 54 F. Supp. 2d 421 (E.D. Pa. 1999) and Williams v. Atlantic City Dep't of Police, No. 08-4900, 2010 WL 2265215 (D.N.J. June 2, 2010)). I disagree.

Arnold's presence in 2607 North Hollywood during the first two controlled buys is disputed. Although Arnold admitted visiting the location both days, he denied being there during the hour the first two controlled buys took place. Arnold Dep. at 25. McKnight, however, testified he saw Arnold open the door for the second controlled buy, N.T. 7/29/14 at 18, even though he failed to note Arnold's identity in his report. See Inv Rep. at 1. Whether McKnight saw Arnold at the location on July 9 is a genuine disputed material fact.

Walker does not support the Commonwealth's argument. In Walker, probable cause to arrest was based on two prior identifications of the arrestee by victims in a pattern of robberies. 54 F. Supp. 2d at 425. Here, however, two of the undisputed facts in this case are that (1) police never witnessed a drug transaction, and (2) the CI did not identify Arnold as the seller. Pl. Sur-

10

Reply (doc. 72) at 4 (citing Campbell Dep. at 50; Toman Dep. at 25; Eleazer Dep. at 130-31; McKnight Dep. at 158-60; Mouzon Dep. at 173).

Similarly, Williams is distinguishable. The Williams court found there was no probable cause to arrest, but nonetheless granted the officers qualified immunity because, based on the law as it existed then, the probable cause determination was a close call. Williams, 2010 WL 2265215, at *6. Williams was found in the living room of his girlfriend's apartment when a search recovered concealed guns and drugs from the back bedroom. Id. at *1. Like here, the search warrant's probable cause affidavit in Williams described potential participation in the criminal activity by an individual whose description the plaintiff at least broadly met. See Id. ("unknown male"); Search Warrant at 3 ("a unknown [black male] let the CI into the property").

The Williams court found the probable cause determination for constructive possession turned on whether what the officers knew "at the time of the arrest suggest[ed] that Plaintiff could have been reasonably expected to have knowledge of the contrabands' presence, and intended and had the capacity to exercise physical control or dominion over it."[4] 2010 WL 2265215, at *4. Although there was "no suggestion . . . that [Williams] was actually present during a drug sale, or that he was in the room where the contraband was kept," the court acknowledged the officers could have reasonably assumed Williams was involved because of "the circumstances under which drug dealers permit others to remain on the premises" and

---

[4] The court in Williams discussed the specific probable cause required for an arrest based on constructive possession, which was also at issue here. Williams, 2010 WL 2265215, at *4; PARS at 2 (listing possession among the charges against Arnold). Like Pennsylvania law, New Jersey law proscribes not just physical possession of illegal substances, but constructive possession as well. Com. v. Hopkins, 67 A.3d 817, 820 (Pa. Super. 2013); State v. Reeds, 962 A.2d 1087, 1096-97 (N.J. 2009). Whether an individual has constructive possession of an item he is not physically holding is determined by whether he still has control or "dominion" over it. Hopkins, 67 A.3d at 820; Reeds, 962 A.2d at 1097.

11

because officers "reasonably believed" Williams's girlfriend was selling drugs to the informant. Id. at *6.

Williams involved no issue of disputed facts. Id. at *1. Here, at least four material facts are in dispute, including whether: (1) Arnold let the CI into the property during the second controlled buy; (2) a large construction tarp concealed the part of the living room used to distribute drugs from the area Arnold was in; (3) Arnold had a key to 2607 North Hollywood; and (4) Arnold told officers he lived at 2607 North Hollywood when he was arrested. If the location was divided, as Arnold claims, and Arnold was only in the part without criminal activity, police may have lacked probable cause to arrest him. Id. at *6. Further, if Arnold was not present during the second controlled buy, did not have a key to the location, and did not live there, the officers may not have had a reasonable basis to believe there was probable cause to arrest him.

A reasonable jury could credit Arnold's sworn version of events. Arnold's sworn testimony is partially corroborated by some of the contradictions in the City's own evidence.[5] For instance, Arnold contends that, on July 9, he left the premises before the controlled buys were made. Arnold Dep. at 24. In contrast, McKnight identified Arnold as the individual who let the CI into the premises during the second controlled buy on July 9. N.T. 7/29/14 at 18.

---

[5] Because of the documentary evidence, I need not address whether evidence beyond plaintiff's sworn testimony is necessary to avoid summary judgment. See Solomon v. Soc'y of Auto. Engineers, 41 F. App'x 585, 586 (3d Cir. 2002) ("a plaintiff cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid a motion for summary judgment"); Cridland v. Kmart Corp., 929 F.Supp.2d 377, 389-90 (E.D. Pa. 2013) (citing Solomon) ("under Third Circuit precedent, a plaintiff's uncorroborated testimony about discriminatory treatment cannot – on its own – demonstrate invidious intent at the summary judgment stage"); but see Socoloski v. Sears Holding Corp., No. 11-3508, 2012 WL 315523, at n.1 (E.D. Pa. Aug 3, 2012) (acknowledging Solomon, but noting Rule 56(c)(1)(A) specifically includes deposition testimony as a method of proving a factual dispute, and "[n]either Rule 56 nor Celotex makes a distinction between a plaintiff's own testimony and the testimony of others").

McKnight's testimony, however, is inconsistent with his own reports. In both his original investigative report and his PARS report, McKnight describes "an unknown black male" letting the CI into the building during the second buy. Inv. Rep. at 1; PARS at 2. On the same page, however, he describes "an unknown black male [later identified as Arnold Steward]" as exiting the premises after the third controlled buy on July 10. Id. Thus, a reasonable jury could read McKnight's report to suggest that Arnold was not the person who dealt with the CI on July 9, and merely left the premises on July 10. Only the fact-finder may resolve such issues. Curley v. Klem, 499 F.3d 199, 215 (3d Cir. 2007) (legal determination reserved for the court and factual determinations reserved for the jury in the qualified immunity context).

Police records could also be interpreted to corroborate Arnold's claims that he did not have the key to 2607 North Hollywood when he was arrested and that he told officers he did not live at 2607 North Hollywood Street. Compare Arnold Dep. at 37 with PR 41 and Inv. Rep. at 1. In his investigative and PARS reports, McKnight wrote that Arnold was arrested in possession of $97 in unmarked bills and the key. Inv. Rep. at 1; PARS at 2. Arnold contends he had only the $97. Arnold Dep. at 56. The documentation submitted at the time of the arrest separates the $97 onto its own receipt, PR 39, while the key is included on the same receipt with several other items, such as three digital scales, that were clearly recovered from the location, not Arnold's person, PR 41. Further, although Mouzon testified Arnold gave only 2607 North Hollywood as his address, the PARS report lists the alternative address on Folsom Street that Arnold says he provided. PARS at 1.

When evaluating the credibility of a witness, a jury may accept all of a witness's testimony, reject all of a witness's testimony, or accept some parts and reject others. Third Circuit Model Jury Instruction 1.7, Preliminary Instruction – Credibility of Witnesses. A jury

13

charged with resolving the factual disputes between Arnold's and the officers' versions of events could decide that at least part of the police version was untrue and thereby reject all of the police testimony. Therefore, a reasonable jury could credit Arnold's contention that the tarp was in place when the search warrant was executed, he was arrested with only unmarked bills, the arresting officers knew he did not live at 2607 North Hollywood Street, and they were aware they had no probable cause to arrest him.

Moreover, if a jury believes Arnold did not have the key when he was arrested, it could also conclude that the police intentionally falsified the investigative and PARS reports to show Arnold had "control" or "dominion" over the location and thereby provide them with probable cause to arrest. See United States v. Lopez, 441 F. App'x 910, 915 (3d Cir. 2011). A reasonable jury could determine that the police are not protected by qualified immunity. Brown v. Muhlenberg Township, 269 F.3d 205, 214 (3d Cir. 2001).

### V. Count VII – Malicious Prosecution

Arnold contends the officers are also responsible for his prosecution. Pl. Resp. at 17.

The elements of a malicious prosecution claim are: (1) the defendant initiated a criminal proceeding against the plaintiff; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendant acted maliciously or for an improper purpose; and (5) he was seized or deprived of his liberty as a result of the criminal proceeding. See Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003).

In most circumstances, a plaintiff cannot establish the "initiation" element of a malicious prosecution claim against a police officer because prosecutors, rather than police officers, initiate criminal proceedings. See O'Connor v. City of Phila., No. 05-02879, 2006 WL 1490134, at *7 (E.D. Pa. May 26, 2006) (citing Stango v. Rodden, No. 00-5709, 2001 WL 1175131, at *4 (E.D.

Pa. Aug. 21, 2001)). A court, however, may find that a police officer initiated a criminal proceeding "if the officer knowingly provided false information to the prosecutor or otherwise prevented the prosecutor from making an informed decision to prosecute." Id.; see also Gallo v. City of Phila., 161 F.3d 217, 220 n.2 (3d Cir. 1998); Henderson v. City of Phila., 853 F. Supp. 2d 514, 518-19 (E.D. Pa. 2012).

Arnold contends much of the evidence against him in the documentation provided to the District Attorney's office was fabricated by police. Pl. Resp. at 13-16. Based on the inconsistencies in the police documents, a reasonable jury could conclude that prosecutors were misled into charging Arnold based on fabricated evidence. Therefore, summary judgment cannot be granted on this claim.

An appropriate Order follows.